The above-entitled cause was heard by the late Vice-Chancellor John Griffin, and was re-referred to me for consideration and decision upon the proofs submitted before him.
Complainant's father, Charles E. Pattberg, died January 23d 1923, a resident of Bergen county, leaving a last will and testament wherein he named William Ernst Pattberg, a son, as executor and trustee. Said instrument was admitted to probate February 2d 1923, and the executor and trustee therein named qualified thereunder. The testator owned, among other property, his homestead, No. 41 Bergen avenue, *Page 373 
Saddle River, New Jersey, and a majority (fifty-one shares) of the capital stock of the Wayside Press, a New Jersey corporation, which conducted a printing business at Saddle River, New Jersey. The testator left him surviving his widow, Maria Pattberg (now deceased), and his children, the complainant, Charles O. Pattberg, and the defendants William Ernst Pattberg and Bertha Gott, the complainant's brother and sister.
The fourth clause of the testator's will reads as follows:
"All the rest, residue and remainder of my estate, real and personal, and wheresoever located, I give, devise and bequeath as follows: A. To my son, William Ernst, an equal undivided one-half thereof, to him, his heirs and assigns, forever. B. To my said son, William Ernst, as trustee, in trust, an equal undivided one-half thereof for the following uses and purposes: To take possession of said undivided one-half of said rest, residue and remainder of my estate, and take care of it and keep it well and securely invested, regarding safety rather than profit, and to be confined to the provisions of the law respecting investment of trust funds; to collect all income from said equal undivided one-half of said rest, residue and remainder, and, after deducting therefrom necessary and legal disbursements, to pay the net income to my daughter, Adele Bertha, wife of Fred. C.H. Gott, for and during the period of her natural life and in such periodical payments as may meet her convenience or needs. In case of illness or disability of my said daughter I direct that my executor, in his judgment and discretion, may apply said income to her use, and application and payment thereof on his part shall be without dispute. And if, in the judgment of my executor, said income shall be found insufficient for the proper care and maintenance of my said daughter, I direct that he shall have the right to expend such portion of principal as he may deem necessary for such purpose. Upon the death of my said daughter, I direct that said trust shall terminate, and give, devise and bequeath said equal undivided one-half of the rest, residue and remainder of my estate to the children of my daughter then living, share and share alike, to them, their heirs and assigns forever."
The complainant was not named as a beneficiary in said will, and, upon the reading of the same shortly after the testator's death, he announced that he was displeased at the terms thereof, and was going to try to file a caveat. He seeks by his bill, to have this court enforce, as an equitable assignment in the nature of a gift, a paper-writing obtained by him from his sister, which reads as follows: *Page 374 
"April 24, 1923.
To whom it may concern: I herewith sign over to my brother, Charles O. Pattberg, 24 shares of Wayside Press stock, left to me through the death of my father, Charles E. Pattberg, to be returned to me or my heirs after his death, also my share of the residence No. 41 Bergen Ave., Saddle River Township, to remain his entire possession, and to do with as his conscience dictates.
MRS. BERTHA GOTT."
The complainant claims to be entitled thereunder to theincome on twenty-four shares of Wayside Press stock and also the income from the testator's homestead, No. 41 Bergen avenue, Saddle River township, New Jersey, as long as he (and his sister) shall live.
The proofs disclose that the complainant, prior to having obtained the aforesaid paper-writing, consulted with several lawyers, who advised him that he could not effect the invalidation of the testator's will; that a man, by his will, could leave his property to whomsoever he pleased, and, in so doing, disinherit one or more of his children. Prior to his having obtained from his sister the aforesaid paper-writing, he told her he had previously read up on cases in the law books in the libraries in Jersey City and New York. His purpose in making such statement was apparently to impress upon her that he, through court proceedings, could invalidate the testator's will. He testified that he stated to his brother and sister that he "could break the will;" his brother expressed the thought that it could not be done, but his sister did not express any opinion with respect thereto. That the complainant did not obtain the aforesaid paper-writing from his sister by fair means, and that he extorted from her an unconscionable bargain is clearly manifest from the proofs. He says: "The morning that paper was written out I went up to Mrs. Gott to get papers which I have in a trunk there — letters, c. — figuring that I would take them down to my attorney and let him go ahead and contest the will, and Mrs. Gott was very much upset about the thing; she had been crying all night; we had been discussing things several days before, or the day before, and she was very much upset; and she had previously offered to give me one-third, which she admitted I was entitled to * * *." "I went up to get the papers, and she was *Page 375 
crying and speaking about the notoriety and disgrace to her girls; and she said, `Pop wanted to change the will and give you something, and I am perfectly willing to give you something, but I cannot give you one-third,' which we had been arguing on and discussing up to that time; so I said, `All right' * * * `anything you want to give me write it down in black and white.'" He further says that, in a conversation with his brother and sister, he said, "I would come darn near ruining the estate;" * * * "that was the argument I gave up to them, and it scared them to death." In reply to a query by Vice-Chancellor Griffin: "That is, you would ruin the estate, whether you won or lost?" complainant replied, "Yes, sir, that is the argument I gave them * * *." Notwithstanding that the complainant's testimony evidences he had several talks with his brother and sister prior to the latter giving to him the paper-writing aforesaid, he made no particular effort to induce his brother to part with any of the interest acquired by him under the testator's will, other than such as put forth by him at a "conference" had between the parties at the office of his brother's attorney, as a result of which his brother and sister condescended that he should have the testator's homestead if their lawyers could arrange to vest a good title thereto in him. With this arrangement complainant says he was satisfied. He did not make known to the parties at said "conference" that he had previously obtained from his sister the paper-writing aforesaid. Following this "conference" he again visited his sister's home and had her minor daughters sign a paper through which he contemplated obtaining their "remainder" interest in the testator's homestead. He says he had previously told his sister he "would take a chance on the girls signing over their portion after they became of age."
His sister's version of the facts and circumstances attending the making and delivery by her of the aforesaid paper-writing is that she had been importuned by the complainant to give him something in writing which he could exhibit to their brother William to persuade the latter to join with her in giving to him a beneficial interest in the testator's estate. She says she drew up and signed and delivered said paper-writing *Page 376 
to the complainant at his suggestion, that it was to be exhibited to their brother William to induce him to give one-half of the twenty-four shares in said paper mentioned. She says it was understood between herself and the complainant that the twenty-four shares mentioned in said paper-writing were to be taken out of the fifty-one shares left by the testator, that half of them were to come from their brother's share and the other half from her share, provided their brother agreed thereto. She says the complainant told her he would never use said paper against her nor file a suit against her upon it. She also says that the complainant represented to her that their brother William had told him to get a writing from her so that he, William, would know that she was willing to give the complainant some stock. She says her only purpose in making and delivering said paper-writing to the complainant was to manifest her willingness to give to him one-half of the twenty-four shares therein mentioned, provided their brother William would give the other half thereof to him. She evidences by her testimony that she made and delivered to the complainant the paper-writing aforesaid through fear of him; that before she signed same complainant threatened to kill both herself and her brother William if he did not get any of the estate. She says she was in personal fear of him at the time she signed said paper, and "he told me that morning that he would not go out of the house until he got this writing to show Will; he said he would not be dilly-dallied around any longer; he said he would end up the whole Pattberg case right then and there in a big writing in the newspapers * * *." She further says, "He vowed he would not go out of the house until he had some writing from me." She also says he was very much excited and she said to him, "Well, if you are only going to use it to show Will and let Will govern the whole thing, I will give you the writing, then." The complainant did not explicitly deny these statements attributed to him.
The proofs disclose that in two prior suits instituted in this court by the complainant (records of which were admitted in evidence), his bills of complaint alleged that his brother and sister each agreed to transfer to him twenty-four shares of *Page 377 
stock of the Wayside Press, and to convey to him their respective interests in the homestead, and that he made no mention therein of the paper-writing aforesaid. It appears from the testimony of Mrs. Gott that she and the complainant had always been very friendly, and "being that Charlie said he would not fight me on these papers, it never mattered, and I never thought he would, being that we were on the friendly terms that we were, because every Sunday we were together * * *."
Notwithstanding that the complainant had endeavored to persuade his brother and sister to afford him the privilege of participating in the testator's estate to the extent of a one-third share thereof, he had no compunction of conscience about depriving his sister of a very substantial part of the provision made for her benefit by the testator's will, for, by force of the paper-writing aforesaid, he would deprive her of the benefit which the testator by his will manifested his desire for her to enjoy. The legal effect of the complainant's claim in this suit based upon the paper-writing aforesaid, if countenanced, would be to deprive Mrs. Gott of such beneficial interest in her father's estate as provided by the fourth clause of his will and confer same upon the complainant, thus circumventing the testamentary purpose of the testator, which, in my judgment, would be inequitable. In view of the fact that Mrs. Gott, under the testator's will, was not to receive any of the corpus of the testator's estate (except such as she might receive from the trustee, within the discretion conferred upon him by the fourth clause of the will), it is manifest that she could not "sign over" to the complainant the twenty-four shares of Wayside Press stock mentioned in said paper-writing. She had no legal claim thereto. She had only the right of income therefrom, limited as it was by the trust clause aforesaid, plus a similar right of income from twenty-seven shares additional, and the income from the homestead. It is clearly apparent from the proofs that if the testator's will were invalidated complainant's sister would materially benefit thereby. Consequently, it does not appear that any consideration inured to her from the complainant's *Page 378 
alleged abandonment of his right to appeal from the probate of the testator's will.
Mrs. Gott could not wittingly have intended to part with the life-interest in the income from one-half of the residuary estate which the testator provided should be paid to her by the trustee "in such periodical payments as may meet her convenience or needs," and, in case of her illness or disability, the trustee may apply said income "to her use — in his judgment and discretion" — clearly a testamentary provision for her personal benefit, the moneys payable under which ought not, in equity, be regarded as assignable, particularly under the facts and circumstances in the case sub judice. It appears to me it should be regarded as unconscionable for the complainant to have exacted from his sister, by means of the paper-writing aforesaid, the income intended by the testator for her personal benefit and welfare, and particularly in view of his solicitous representation to his sister and brother that the estate should be divided between them in three equal parts. If the relief sought by the complainant in his bill should be countenanced by this court, the alleged injustice of which he complained to his sister and brother — that is, the non-division of the testator's estate into three equal parts, would be suffered by the defendant Mrs. Gott.
The complainant urges, as justification for the granting to him of the relief sought by him in the case sub judice, that inasmuch as he contemplated appealing from the probate of the testator's will (the proofs disclose, however, that he did not take any affirmative action to effectuate such a purpose), and abandoned his right so to do after receiving from his sister the paper-writing aforesaid, he cannot now be restored to his right of appeal, and therefore, said paper-writing should be sustained as an equitable assignment of the income aforesaid. While said paper-writing ostensibly manifests a gift inter vivos to the complainant by his sister, it cannot operate as such. It is essential to the validity of a gift that not only must the intention to make a gift be supported by clear and convincing evidence, but all of the legal requisites of a valid gift must be clearly manifest. Mullen v. Mullen, 98 N.J. Eq. 728.
Certificates of stock may be *Page 379 
subject of gift, but, in order to effect a gift thereof, there must be delivery and intent to make a gift. 12 R.C.L. 942.
Furtheremore, the Uniform Stock Transfer act (P.L. 1916 p.398), provides (section 1) that title to a stock certificate "and to the shares represented thereby" can be transferred onlyby delivery of the certificate, endorsed or accompanied by a written assignment or power to assign. In Besson v. Stevens,94 N.J. Eq. 549 (at p. 562), the court of errors and appeals, in referring to the aforesaid statutory provision, says: "The statute does not expressly so state, but the necessary implication, of course, is that the delivery shall be made to the transferee or to the transferee's agent in that behalf."
Counsel for the complainant, in a brief submitted to the court, says: "I have examined the reports in regard to matters of this nature, but have been unable to find, in this state, any case just like the one at bar."
The complainant's sister apparently reposed implicit confidence in him, and having obtained from her the paper-writing aforesaid, it is incumbent upon him to show affirmatively that no deception was practiced by him in obtaining same, and no undue influence used by him upon her, and that his conduct was fair, and that the transaction was well understood by her. It is essential to the maintenance of the paper-writing in question as an equitable assignment, that Mrs. Gott fully comprehended the force and effect of said instrument, and that she thoroughly understood what she was about when she made and delivered same to him. It is a well-established principle of equity that persons standing in a confidential relationship towards others cannot obtain advantages which the others may have conferred upon them unless they can show to the satisfaction of the court that the person conferring the benefit or advantage had obtained some independent advice in the transaction. Slack v. Rees, 66 N.J. Eq. (at p. 449);Hall v. Otterson, 52 N.J. Eq. 528; affirmed, 53 N.J. Eq. 695;Post v. Hagan, 71 N.J. Eq. 234.
In Suffern Galloway v. Butler, 19 N.J. Eq. 202; affirmed,21 N.J. Eq. 410, it is said: "A court of equity will not lend its aid to enforce an unjust and unconscionable bargain, even if its due execution be duly proved * * *." The *Page 380 
court, in the aforesaid case, also pertinently stated that which is applicable to the case sub judice: "The paper * * * is, on its face, so one-sided and inequitable, that it is hardly possible to conceive that any person, however ignorant of business or conveyancing, if of full age, and in any degree removed from idiocy, would execute it, if he fully understood its contents."
This court, in order to grant to the complainant the relief sought by him, must be satisfied his claim is fair, reasonable and just. Crane v. DeCamp, 21 N.J. Eq. 414 (at p. 418);Worth v. Watts, 76 N.J. Eq. 299 (at p. 305). A court of conscience cannot properly award relief such as sought by the complainant in the case sub judice, when, to do so, is subversive of justice between the parties. In Eaton Eq. 74, it is said the court will refuse its aid in the enforcement of a contract where the complainant has been guilty of any unconscionable conduct which does not amount to legal fraud.
In Stoutenburgh v. Tompkins, 9 N.J. Eq. 332, it is said: "This court will not become an instrument of injustice, and if the case presented is such that it would be unconscionable to grant the complainant the relief he seeks, and repugnant to a just sense of right between man and man, the court will refuse its aid * * *. The defendant may be unable to prove any mistake, fraud or accident in reference to its execution, and yet the conduct of the complainant may have induced such a state of things in relation to the subject-matter of the agreement as to make it not only proper, but the plain duty of the court to refuse its aid in enforcing its specific performance."
In First National Bank of Houtzdale v. Parker, 87 N.J. Eq. 595,
it is said a court of equity will examine, not only the transaction in question, but the relations of the parties and all of the surrounding circumstances, to the end that if there is a well-grounded suspicion of fraud or deception it may withhold its aid.
If "an atmosphere of suspicion surrounds and permeates the whole case," a court of equity will refuse its relief. Worth v.Watts, supra. *Page 381 
The aforesaid authorities are applicable, in my judgment, to the case sub judice.
I deem it unnecessary to dwell particularly upon the relief sought by the complainant for an accounting by the defendant William Ernst Pattberg as executor and trustee of the testator's estate. I may say, in passing, however, that it appears from the proofs that the complainant did not make a demand upon said defendant for payment to him of such moneys as he claimed to be entitled to as income from the testator's estate as was payable to the defendant Bertha Gott, basing his right thereto upon the paper-writing in question. The complainant says he made demand therefor as a blood relation and as a legal heir. He was asked by the vice-chancellor: "Then you did not make it by virtue of having a right under this assignment?" and he replied, "No, I did not." In Kennedy v. Tranquility Cemetery Co., 84 N.J. Eq. 632,
it is said that on a bill seeking an accounting the first inquiry should be as to whether the complainant is entitled to an account at all, and the court, for such purpose, listens to evidence, upon the original hearing, tending to develop the fact of liability. The complainant is not entitled to an accounting from the defendant William Ernst Pattberg as executor and trustee aforesaid.
I am of the opinion that the complainant's bill of complaint should be dismissed, and I will advise a decree to effect a dismissal thereof.
I am also of the opinion that the defendant Bertha Gott is entitled to a decree on her counter-claim against the complainant wherein she prays that the paper-writing aforesaid be declared invalid and of no legal force or effect as an assignment or transfer of any interest which she obtained by virtue of the testator's last will and testament aforesaid, and that the complainant (defendant to said counter-claim) be restrained from taking any further proceedings, based upon said paper-writing, in any court of law or equity, and I will advise a decree accordingly. *Page 382